**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3501-23

DALE W. EGGERT,

      Petitioner-Appellant,

v.

NEW JERSEY DEPARTMENT
OF COMMUNITY AFFAIRS,
DIVISION OF FIRE SAFETY,

      Respondent-Respondent.

_____

Argued January 21, 2026 – Decided July 31, 2026

Before Judges Gooden Brown and DeAlmeida.

On appeal from the New Jersey Department of Community Affairs, Docket No. 174710.

Ellen M. McDowell argued the cause for appellant (McDowell Law, PC, attorneys; Ellen M. McDowell and Amanda E. Hopkins, of counsel and on the briefs).

Andrew Hedin, Deputy Attorney General, argued the cause for respondent (Jennifer Davenport, Acting Attorney General, attorney; Donna Arons, Assistant Attorney General, of counsel; Andrew Hedin, on the brief).

PER CURIAM

Petitioner Dale W. Eggert, former chief of the Tuckerton Volunteer Fire Company No. 1 (TVFC), appeals from the May 30, 2024 final agency decision of the Commissioner of the Department of Community Affairs (DCA) adopting the initial decision of the Administrative Law Judge (ALJ), upholding revocation of Eggert's seven firefighting certifications. The revocation was grounded in findings that Eggert failed to ensure compliance with State staffing, training, and inspection requirements; failed to timely remediate deficiencies identified by the DCA's Division of Fire Safety (DFS) during its investigation; and engaged in misconduct by using an unauthorized radio and call sign to report a non-functioning traffic light after the TVFC had been suspended. We affirm.

I.

Eggert was the Fire Chief of the TVFC from 2017 to August 15, 2022. As Fire Chief, Eggert was responsible for directing the TVFC's response to calls involving fires or other emergencies, like motor vehicle crashes; ensuring compliance with mandatory training requirements for himself and other TVFC firefighters; and administering the operational aspects of the TVFC.

In March 2022, DFS began investigating the TVFC based on an anonymous complaint that "it took the [TVFC] more than half an hour to

2

respond" to a carbon monoxide call and only one firefighter arrived on scene. According to the complainant, the lone firefighter did not have the proper personal protective equipment (PPE) or the correct meter and did not know how to operate the meter.

After receiving the complaint, Donald Nelsen, a DFS Senior Planner for Emergency Management and Fire, met with Eggert and Jenny Gleghorn, the Borough Administrator, on March 7, 2022, to initiate the investigation. At the meeting, Nelsen requested documents such as the standard operating procedures, insurance service organization ratings, training records, response reports, a copy of the respiratory protection program (RPP),[1] and an active roster list.[2]

On March 21, 2022, Eggert provided the roster list, showing the TVFC had twelve active firefighters, violating the National Fire Protection Association

---

[1] As noted by the ALJ, "[t]he respiratory [protection] program is required by the Occupational Safety and Health Administration (OSHA)." See 29 C.F.R. 1910.134. The State has a similar OSHA program—Public Employees Occupational Safety and Health (PEOSH), N.J.S.A. 34:6A-25 to -50. According to Nelsen, while some fire departments utilize the OSHA standards, the majority of public fire departments "u[tilize] the PEOSH Administrative Code of Standards."

[2] At the meeting, Gleghorn provided Nelsen with the Tuckerton Borough Ordinance recognizing the Tuckerton Municipal Fire Department and delineating some of the qualifications of the fire company. See Tuckerton, N.J., Code § 29.

(NFPA) standard for the required number of firefighters available to respond to Borough calls. Because Tuckerton is in the "urban demand zone" based on the NFPA standard, according to Nelsen, at least fifteen firefighters are required to be on scene at a building or structure fire "within nine minutes ninety percent of the time." In addition, the roster list contradicted DFS's internal records which indicated the TVFC had a roster of approximately eighty firefighters. Eggert subsequently provided DFS with a written submission explaining the former firefighters on the list had "resigned" or were "long gone."

Upon further investigation, DFS discovered other violations. The 2021 response reports provided by Eggert in June 2022 showed that out of the twelve active firefighters, only four met the New Jersey State Fireman's Association (SFA) standard, which required a firefighter to respond to at least twenty-five percent of the calls, and only two (Eggert and his father) met the Borough ordinance standard, which required a firefighter to respond to at least sixty percent of the calls.[3] The response reports for the first several months of 2022

---

[3] The Borough ordinance required each firefighter "to perform at least [sixty] percent of duty" comprised "of actual attendance and duty at fires and drills." Tuckerton, N.J., Code § 29-2. Although the DFS did not specifically request records pertaining to firefighters' attendance at fire drills, they were not provided by Eggert.

showed five firefighters met the SFA standard and the same two (Eggert and his father) met the Borough standard.

Additionally, DFS reported eleven of the twelve active TVFC firefighters had certification deficiencies:

> Six firefighters lacked documentation of the Firefighter 1 and Hazardous Materials: Awareness and Operations certifications. Six firefighters lacked documentation of Hazardous Materials: Awareness and Operations certifications, including Eggert and his father . . . . One firefighter lacked documentation of his Incident Safety Officer training. Three firefighters lacked documentation of their Incident Management System Level 1 certifications.

DFS notified Eggert of the deficiencies on April 22, 2022, and required plaintiff to "submit proof[s] of the deficient certifications by June 1, 2022." On June 1, 2022, Eggert began submitting the documentation to correct the certification deficiencies. However, the submitted documents were incomplete as some lacked the firefighters' signatures, driver's licenses, birth certificates, and other supporting documentation. DFS notified Eggert of the deficiencies in a June 6, 2022 email and advised Eggert how to cure the deficiencies.

Because the TVFC only had twelve active firefighters instead of the required fifteen, DFS advised Eggert to enter into memoranda of agreements (MOAs) with fire companies of contiguous municipalities. Eggert was told the

MOAs had to specify "the contiguous fire companies would automatically be dispatched to all reported or actual structure or building fires in Tuckerton." Eggert submitted MOAs that were unacceptable to DFS because the MOAs stated that "after arriving on scene, the [TVFC] would evaluate whether they needed additional assistance and if so, would immediately contact fire companies." Eggert's revised MOAs were equally unacceptable because the revisions stated contiguous fire companies "would merely provide 'manpower,'" rather than "a full dispatch, including fire apparatuses, engines, and ladders." Eggert eventually submitted compliant MOAs between the TVFC, Parkertown Fire Company, and West Tuckerton Fire Company.

Additional violations included a May 16, 2022 citation for failure to provide a respiratory fit test. Although Eggert claimed the fit testing was adversely impacted by the COVID-19 pandemic, it was performed shortly after the inspection but before the citation. The TVFC had received prior fit testing and PEOSH violations during Eggert's tenure as Chief, including a 2019 warning from PEOSH for a firefighter responding to a fire scene without proper PPE, and nine serious PEOSH citations in June 2018.

The TVFC was suspended from operations on June 7, 2022. After the TVFC was suspended, Eggert provided DFS with some of the documents

A-3501-23

requested in March 2022. For example, Eggert provided DFS with a compliant RPP, having previously only provided "a one-page copy of the self-contained breathing apparatus regulations, which was only one part of the RPP."

During the investigation and after the suspension, Eggert reportedly made public comments in local newspapers and at Council meetings. The June 16, 2022 issue of the Asbury Park Press quoted Eggert as stating that "the problems raised" by the investigation "were largely 'a paperwork issue' that he accepts responsibility for." The Tuckerton/Little Egg Harbor Leader reported on the March 21, 2022 Tuckerton Borough Council meeting as follows:

> Eggert then thanked the anonymous person who had reported the [TVFC] to the state [DFS]. In addition to being commended by the [DFS] for having adequate paperwork (with the exception of one document which [Eggert] claimed to be in the process of submitting), the [DFS] gave the Eggerts advice on how to secure grant money to improve their squad and its efforts.

The comments prompted DFS to tell Eggert on multiple occasions to not make "false and misleading statements" about DFS's investigation.

Following the TVFC's suspension, Eggert was involved in a traffic incident. While driving at about 9:41 a.m. on July 25, 2022, Eggert encountered a non-functioning traffic light caused by a power outage at an intersection in Tuckerton. Near the intersection was a motor vehicle accident. With a portable

radio, Eggert "reported the incident to County Dispatch using the SOT-3 call sign."[4]  According to Joseph Jubert, Ocean County Chief Fire Coordinator, the SOT is "a resource used for water supply in the southern part of [Ocean] County" and "anyone authorized to use that call sign" would have had to be "designated through the [Southern Ocean Tanker] task force."  After Eggert used the SOT-3 call sign, Jubert directed Eggert to not "use the SOT-3 call designation because [Eggert] was not with an affiliated [f]ire [c]ompany" as the TVFC had been suspended at the time.

On the same date, Frank D'Amore, Tuckerton Borough Councilman, reported he was contacted by County Dispatch and "asked . . . if there [were] any changes in the [TVFC] being out of service."  D'Amore replied that the TVFC remained out of service.  In response, County Dispatch informed D'Amore that Eggert "had a radio and was transmitting with the radio and it was interfering with the accident or the scene of the accident."  D'Amore became "concerned that if anything happened as a result of Eggert calling the incident into County Dispatch, it could affect the coverage set up for Tuckerton by

---

[4]  The portable radio was provided to Eggert by the Forked River Fire Department.  Gleghorn indicated the Forked River Fire Department loaned five radios to the TVFC.  While four radios had already been returned, Gleghorn stated Eggert utilized the fifth, which had not been returned, to report the incident.

8

Nelsen." Nelsen also received multiple "complaint[s]" concerning Eggert's use of the SOT-3 call sign with the portable radio.

After DFS concluded its investigation, it issued a letter dated August 15, 2022, informing Eggert his "New Jersey Firefighter I, Firefighter II, Hazardous Materials: Awareness, Hazardous Materials: Operations, Incident Management Level 1, Incident Management Level 2[,] and Incident Management Level 3 certifications" were permanently revoked pursuant to N.J.A.C. 5:73-1.9(a)(3), (a)(4), (a)(6), and (a)(7).

N.J.A.C. 5:73-1.9(a) provides:

> The [DFS] may suspend and/or revoke a certification . . . if . . . [it] has determined that the holder:
>
> . . . .
>
> 3.  Has been grossly negligent or has engaged in misconduct in the performance of any of his or her duties;
>
> 4.  Has failed, over a period of time, to maintain a minimally acceptable level of competence;
>
> . . . .
>
> 6. Has made a false or misleading written statement, or has made a material omission in any submission to the Department; or

>    7.    Has violated any provision of this chapter.

The revocation letter, which was signed by DFS's Office of Training and Certification Supervisor Kent Neiswender, stated Eggert violated N.J.A.C. 5:73-1.9(a)(3) by utilizing a Forked River Fire Department "portable radio" on July 25, 2022, "to request police roadblocks and traffic diversion [after] two contiguous fire companies . . . had . . . already cleared . . . the scene." According to the letter, Eggert was supposed to have returned the portable radio when the TVFC was suspended and was not authorized to utilize the SOT-3 call sign as it "was not in service and thus not applicable at the time." Further, Eggert's use of the call sign "created mayhem in the Ocean County Sheriff's Communication Center and amongst Tuckerton and Little Egg Harbor Police Departments."

The letter further provided Eggert violated N.J.A.C. 5:73-1.9(a)(4) based on nine previous PEOSH violations that occurred in 2018, three previous PEOSH violations that occurred in 2019, and a PEOSH repeat citation that occurred in 2022. Regarding N.J.A.C. 5:73-1.9(a)(6), the letter relied on numerous statements and omissions, including Eggert providing inaccurate roster reports of active firefighters, deficient firefighter application packets, inadequate MOA language, and misleading public comments.

Lastly, according to the revocation letter, Eggert violated N.J.A.C. 5:73-1.9(a)(7) as follows:

> Eggert's continual erroneous and misleading public statements, fabricated and inaccurate private statements before the Ocean County Fire Chief's Association general membership meeting, social media posts as head of the [TVFC], and demonstrated non-compliance with the multitude of required documents and answers to complaints on multiple counts has subverted the authority of [DFS] . . . , publicly minimized the importance of the Office of Training and Certification . . . , falsely misled the public and investigators by submitting multiple application packages for certifications . . . while publicly stating the [TVFC] was in compliance and "commended" by [DFS] for only "needing [one] document."

The letter added Eggert

> continually flaunted referenced standards and publications, particularly PEOSH subchapter [ten] Firefighting and NFPA 1720 Standard for the Organization and Deployment of Fire Suppression Operations, Emergency Medical Operations, and Special Operations to the Public by Volunteer Fire Departments as evidenced by their [o]rders to [c]omply with monetary penalties as well as the Mayor and Council of Tuckerton suspending their operations indefinitely due to inability to obtain staffing and response schedules of NFPA 1720.

Eggert challenged the revocation and the matter was transferred to the Office of Administrative Law (OAL) as a contested case for a hearing before an ALJ. During the three-day hearing, for DFS, the ALJ heard testimony from

11

Nelsen, Gleghorn, Jubert, and D'Amore. Eggert testified on his own behalf and produced Neiswender; Thomas Wetmore, New Gretna's Fire Department Chief; Ernie Toriano III, Wildwood's Fire Department Chief; and Charles Uhl, Galloway Township's Ambulance Squad Chief.[5]

On March 1, 2024, the ALJ issued an initial decision sustaining Eggert's violations of N.J.A.C. 5:73-1.9(a)(3), (4), (6), and (7), and revocation of his seven certifications. The ALJ determined DFS had proven the violations by a preponderance of the credible evidence. In assessing credibility, the ALJ found "Gleghorn, Jubert, D'Amore, Wetmore, Uhl, Neiswender and Toriano all appeared to be honest, forthright, and credible witnesses," who provided "clear, consistent, and believable testimony."

Turning to Nelsen's testimony, which Eggert hotly disputed and sought to discredit during the hearing, the ALJ stated:

> Nelsen's testimony was knowledgeable and professional, and he is an experienced investigator whom D'Amore described as a great liaison. Throughout the hearing and in the post-hearing submissions, [Eggert] repeatedly sought to make Nelsen himself the issue, maintaining that his opinions and recommendations were at issue in this matter. Specifically, [Eggert] argues that "misleading statements" in Nelsen's testimony "establish a

---

[5] Wetmore, Toriano, and Uhl mainly vouched for Eggert's firefighting capabilities.

pervasive lack of credibility on his part" and that his testimony was "fiction" or "gross exaggeration." These arguments are both unfounded and unsupported by the record.

The ALJ dismissed Eggert's attacks on Nelsen's investigation and the revocation letter, the contents of which were largely supplied to Neiswender by Nelsen, noting "this is a de novo hearing, and the investigation itself is not at issue." The ALJ continued, "Rather, at issue is whether [DFS] has met its burden to demonstrate, by the preponderance of the competent and credible evidence, that Eggert's substantiated conduct meets the standard to support [DFS's] determination to revoke his certifications." The ALJ also rejected Eggert's selective use of portions of Nelsen's testimony to impugn his credibility, describing Eggert's argument as "a gross misrepresentation of Nelsen's testimony." The ALJ found nothing in Nelsen's "tone, expression, or demeanor" to lead him to believe Nelsen "was not being truthful" and concluded "Nelsen's testimony was based upon the information provided by Eggert himself."

Conversely, the ALJ found Eggert's testimony lacked credibility. According to the ALJ, "Eggert's testimony was largely self-interested and unsupported, was replete with examples of passing the buck to others, failed to take any responsibility as chief for the actions of the TVFC, and included plainly unreasonable assumptions." The ALJ elaborated, "[M]uch of [Eggert's

testimony] was unsupported by any documentary evidence or corroborating testimony, and in other instances was rebutted by credible witness testimony." Accordingly, the ALJ made factual findings largely consistent with Nelsen's testimony, rebutting in large part Eggert's competing contentions.

Turning to the legal analysis, the ALJ first addressed whether DFS "ha[d] sufficient authority . . . to determine whether [Eggert's] actions as chief of the TVFC support[ed] the revocation of his certifications." Relying on this court's unpublished opinions and other administrative agency decisions, the ALJ held Eggert's "substantiated conduct as chief could meet the standards for revocation under N.J.A.C. 5:73-1.9(a)."

Addressing the specific allegations, the ALJ determined Eggert's "unauthorized" use of "the SOT-3 call sign" while the TVFC was suspended, causing "confusion at County Dispatch," constituted "misconduct in the performance of his duties," in violation of N.J.A.C. 5:73-1.9(a)(3). The ALJ explained:

> [DFS] argues that Eggert's unauthorized use of the SOT-3 call sign on July 25, 2022, "caused confusion and concern among emergency responders in the County and the Borough." [Eggert] contends that [he] was authorized to utilize the call sign and that the incident "proved that Eggert is a civic-minded first responder who put himself in harm's way to protect the public and did what any first responder would do to

obtain assistance to avert harm in a dangerous situation."

Whether Eggert's reporting of the accident was civic-minded is not at issue. In fact, Nelsen testified that if Eggert had "used a 9[-]1[-]1 . . . phone [call] instead of the radio then we wouldn't even be here." However, as the TVFC was suspended on June 7, 2022, he was not affiliated with a fire company. While Eggert testified that D'Andrea told him that he "still sat in the position of SOT-3" until his decertification, D'Andrea did not testify, and this self-interested testimony was unsupported. Following the incident, he spoke to Jubert, who advised that he could not use the SOT-3 call sign "because he was not with an affiliated Fire Company with that task force" since the TVFC was suspended.

The record is devoid of any substantiation of Eggert's claim that he was authorized to use the SOT-3 call sign on July 25, 2022; however, it is evident that had he spoken to Jubert prior to that date, he would have known that in fact he was not authorized. Eggert surely knew that the TVFC was suspended, and it was incumbent on him to determine if he remained authorized to use the SOT-3 call sign. The record demonstrates that he failed to do so.

Next, the ALJ determined DFS met its burden of establishing Eggert "failed, over a period of time, to maintain a minimally acceptable level of competence," in violation of N.J.A.C. 5:73-1.9(a)(4). In support, the ALJ cited "the PEOSH violations, staffing issues, and [Eggert's] failure to submit a compliant MOA prior to the suspension of the TVFC." Regarding the PEOSH

violations, according to the ALJ, "the record demonstrates that TVFC has repeated PEOSH violations during Eggert's tenure as [C]hief." The ALJ continued, "Notwithstanding Eggert's efforts to deflect responsibility for the PEOSH violations, as [C]hief, he bore the ultimate responsibility."

The ALJ found "[t]he staffing issues at the TVFC were also well documented." The ALJ elaborated:

> The roster, current as of February 3, 2022, provided by Eggert on March 21, 2022, showed that the TVFC had twelve active firefighters, which put the TVFC in violation of the NFPA standards for the required number of firefighters available to respond to calls for the Borough.
>
> The number of active firefighters prevented the TVFC from having at least fifteen firefighters on scene within nine minutes [ninety] percent of the time, as required by Tuckerton being in the urban demand zone. Additionally, the SFA requires a firefighter to respond to at least [twenty-five] percent of incoming calls, and by ordinance, the Borough requires "at least [sixty] percent of duty to be composed of actual attendance and duty at fires and drills" for active members of the TVFC. However, the response percentages for 2021 showed that four of the twelve available firefighters met the SFA standard of [twenty-five] percent, one of whom was Eggert. Therefore, according to the Borough standard of [sixty] percent, only two firefighters met that standard, Eggert and his father . . . . The response percentages for the first few months of 2022 showed that five firefighters met the SFA standard and only two, Eggert and his father . . . met the Borough standard. These percentages were below the

SFA standards. While the Division did not specifically request records pertaining to firefighters' attendance at fire drills, Eggert had sufficient opportunity to provide such information but did not.

[DFS] also determined that the roster demonstrated that eleven of the twelve firefighters had certification deficiencies. Eggert was notified by [DFS] via email on April 22, 2022, about these deficiencies and was asked to submit proof of the deficient certification by June 1, 2022. In Eggert's June 1, 2022[] response, all eighteen applications submitted were deficient.

Addressing the MOAs, the ALJ noted:

Eggert was advised that since the TVFC had twelve active firefighters rather than fifteen, it would need to enter into MOAs with the fire companies of contiguous municipalities that were required to state that the contiguous fire companies would automatically be dispatched to all reported or actual structure or building fires in Tuckerton in order to meet the fifteen-firefighter requirement. Following the submission of several deficient MOAs, a sufficient one was submitted between the TVFC and Parkertown Fire Company and West Tuckerton Fire Company on June 7, 2022. However, as [DFS] notes, "[b]y the time Eggert provided compliant MOAs, the [T]VFC had been suspended from service and the MOAs were then of 'no use whatsoever.' Therefore, Eggert was unable to provide [DFS] with adequate MOAs providing sufficient fire coverage for the Borough in time for them to have any effect or benefit to the citizens of the Borough."

The ALJ agreed with DFS's argument that Eggert "was not a rank-and-file firefighter but the Fire Chief of the [TVFC], who bore ultimate responsibility for the fire company, its compliance with health and safety rules, and its compliance with [DFS] document requests."

Next, the ALJ determined DFS met its burden of establishing Eggert made a false or misleading written statement or made a material omission in a submission to DFS in violation of N.J.A.C. 5:73-1.9(a)(6).[6] The ALJ reasoned "Eggert failed over the course of several months to provide the documentation requested by [DFS] regarding the certification deficiencies for members of the TVFC" and "[t]he eighteen applications provided to [DFS] on June 1, 2022, remained deficient." As to DFS's inquiry concerning the discrepancy between its internal roster and the roster provided by Eggert, the ALJ found Eggert responded with "insufficient responses including 'resigned' and 'long gone.'"

Further, the ALJ found "Eggert's responses to [DFS's] requests made in furtherance of its investigation were not a 'good faith effort.'" The ALJ explained that "[p]rior to Eggert's submission of a compliant RPP following the suspension of the TVFC, he had only provided a one-page copy of the self-

---

[6] The ALJ determined DFS did not meet its burden of establishing a violation of N.J.A.C. 5:73-1.9(a)(6) based on Eggert's public statements in newspaper articles or meeting minutes.

contained breathing apparatus regulations, which was only one part of the RPP," and he "submitted non-compliant MOAs" before finally complying. The ALJ concluded "the record support[ed DFS's] argument that '[t]hese repeated omissions to the requested information . . . prevented [DFS] from conducting its investigation and being able to determine whether the [T]VFC was adequately providing fire coverage to the citizens of the Borough.'" Because DFS "met its burden" on the previous violations, the ALJ also sustained "[t]he charge of violating N.J.A.C. 5:73-1.9(a)(7)."

Eggert filed exceptions to the initial decision challenging the ALJ's findings of fact and conclusions of law, particularly the ALJ's credibility assessments. On May 30, 2024, the DCA Commissioner adopted the ALJ's initial decision "in its entirety." The Commissioner determined the ALJ properly assessed the witnesses' credibility, including Eggert's and Nelsen's, and Eggert's "remaining exceptions raise[d] issues that the ALJ also specifically and thoroughly addressed." The Commissioner concluded:

> After carefully weighing the evidence presented by the parties, the ALJ correctly determined that [DFS] met its burden of proof with respect to each charge and that [DFS] is fully authorized, through its obligation to enforce the [Uniform Fire Safety Act (UFSA)], N.J.S.A. 52:27D-192 to -213, and its "comprehensive regulations setting standards for fire service training

and certification[, N.J.A.C. 5:73-1.1 to -18.9]," to revoke Eggert's certifications.

This appeal followed.

On appeal, plaintiff makes the following arguments:

> [I.] THE DCA'S DECISION TO REVOKE CHIEF EGGERT'S FIREFIGHTER CERTIFICATIONS BASED ON NELSEN'S STATEMENTS SHOULD BE OVERTURNED BECAUSE THE DETERMINATION WAS ARBITRARY, CAPRICIOUS, . . . UNREASONABLE, [AND] UNSUPPORTED BY SUFFICIENT, COMPETENT, AND CREDIBLE EVIDENCE.
>
> . . . .
>
>> [A.] No Adjudicator Could Reasonably Conclude that Chief Eggert Engaged in Gross Negligence or Misconduct in Performance of Duties, per [N.J.A.C.] 5:73-1.9(a)(3).
>>
>> [B.] The DCA's Decision that Chief Eggert Failed Over a Period of Time to Maintain a Minimally Acceptable Level of Competence is Unreasonable, per [N.J.A.C.] 5:73-1.9(a)(4).
>>
>> [C.] The Determination that Eggert Made a Material Omission in a Written Submission to the Department was Arbitrary, Capricious, and Unreasonable.
>>
>> [D.] The Revocation Letter Should Have Been Considered.

20

. . . .

[II.] [THE] A.L.J.['S] . . . CREDIBILITY DETERMINATIONS ARE UNSUPPORTED BY THE RECORD.

A. No Unbiased Adjudicator Could Determine Nelsen Was Credible.

B. The Determination that Eggert was Not Credible Was Arbitrary, Capricious, And Unreasonable.

[III.] DCA'S DECISION SHOULD BE REVERSED DUE TO THE SEVERITY OF THE SANCTIONS IN CONTRAST TO THE ALLEGED VIOLATIONS.

[IV. DFS] ACTED ULTRA VIRES, OUTSIDE THE BOUNDS OF ITS AUTHORITY, IN REVOKING EGGERT'S CERTIFICATIONS. (NOT RAISED BELOW).

[V.] THE DCA MISINTERPRETED THE LAW IN REVOKING EGGERT'S CERTIFICATIONS.

II.

At the outset, we acknowledge our standard of review of an administrative agency's decision is limited, In re Stallworth, 208 N.J. 182, 194 (2011), and we afford "substantial deference" to the actions of administrative agencies "because of the 'expertise and superior knowledge' of agencies in their specialized fields," In re License Issued to Zahl, 186 N.J. 341, 353 (2006) (quoting Greenwood v. State Police Training Ctr., 127 N.J. 500, 513 (1992)); see Stallworth, 208 N.J.

21

at 194 ("A reviewing court 'may not substitute its own judgment for the agency's, even though the court might have reached a different result.'" (quoting In re Carter, 191 N.J. 474, 483 (2007))). Therefore, we will not reverse an agency's decision "unless there is a clear showing that it is arbitrary, capricious, or unreasonable, or that it lacks fair support in the record." Mount v. Bd. of Trs., Police & Firemen's Ret. Sys., 233 N.J. 402, 418 (2018) (quoting Russo v. Bd. of Trs., Police & Firemen's Ret. Sys., 206 N.J. 14, 27 (2011)).

To determine whether an administrative agency's decision is arbitrary, capricious, or unreasonable, we must assess:

> (1) whether the agency's action violates express or implied legislative policies, that is, did the agency follow the law;
>
> (2) whether the record contains substantial evidence to support the findings on which the agency based its action; and
>
> (3) whether in applying the legislative policies to the facts, the agency clearly erred in reaching a conclusion that could not reasonably have been made on a showing of the relevant factors.
>
> [Allstars Auto Grp., Inc. v. N.J. Motor Vehicle Comm'n, 234 N.J. 150, 157 (2018) (quoting Stallworth, 208 N.J. at 194).]

"'Substantial evidence' means 'such evidence as a reasonable mind might accept as adequate to support a conclusion.'" Figueroa v. N.J. Dep't of Corr.,

22

414 N.J. Super. 186, 192 (App. Div. 2010) (quoting In re Pub. Serv. Elec. & Gas Co., 35 N.J. 358, 376 (1961)). "The burden of proving that an agency action is arbitrary, capricious, or unreasonable is on the challenger." Parsells v. Bd. of Educ. of Somerville, 472 N.J. Super. 369, 376 (App. Div. 2022), aff'd as modified, 254 N.J. 152 (2023).

Although we will not "substitute [our] own judgment for the agency's," Allstars Auto Grp., Inc., 234 N.J. at 158 (quoting Stallworth, 208 N.J. at 194), we are "in no way bound by [an] agency's interpretation of a statute or its determination of a strictly legal issue." Ibid. (second alteration in original) (quoting Dep't of Child. & Fams., DYFS v. T.B., 207 N.J. 294, 302 (2011)). Nevertheless, "we defer to [agency] fact[-]findings that are supported by sufficient credible evidence in the record." McClain v. Bd. of Rev., Dep't of Lab., 237 N.J. 445, 456 (2019).

Under N.J.S.A. 52:14B-10(c), "[a]ll hearings of a State agency required to be conducted as a contested case under this act or any other law shall be conducted by an [ALJ,]" who then issues a decision "recommend[ing] findings of fact and conclusions of law" to the agency. "[U]pon a review of the record submitted by the [ALJ]," the agency

> may reject or modify findings of fact, conclusions of
> law or interpretations of agency policy in the decision[]

but shall state clearly the reasons for doing so. The agency . . . may not reject or modify any findings of fact as to issues of credibility of lay witness testimony unless it is first determined from a review of the record that the findings are arbitrary, capricious[,] or unreasonable or are not supported by sufficient, competent, and credible evidence in the record.

[Ibid.]

"Under this statute, it is not for this court 'or the agency head to disturb [a] credibility determination, made after due consideration of the witnesses' testimony and demeanor during the hearing.'" In re Snellbaker, 414 N.J. Super. 26, 36 (App. Div. 2010) (alteration in original) (quoting H.K. v. State of N.J. Dept. of Human Servs., Div. of Med. Assistance and Health Servs., 184 N.J. 367, 384 (2005)). Indeed, an agency is "not at liberty to simply substitute its judgment for that of the ALJ's." Cavalieri v. Bd. of Trs. of Pub. Emps. Ret. Sys., 368 N.J. Super. 527, 534 (App. Div. 2004). ALJs are not to be considered "second-tier players or hold an inferior status as factfinders." In re Hendrickson, 235 N.J. 145, 160 (2018). Instead, we give "due regard to the opportunity of the one who heard the witnesses to judge . . . their credibility," In re Taylor, 158 N.J. 644, 656 (1999) (quoting Close v. Kordulak Bros., 44 N.J. 589, 599 (1965)), and defer to credibility findings "that are often influenced by matters such as observations of the character and demeanor of witnesses and common human

experience that are not transmitted by the record," State v. Locurto, 157 N.J. 463, 474 (1999).

Where the record "can support more than one factual finding, it is the ALJ's credibility findings that control, unless they are arbitrary or not based on sufficient credible evidence in the record as a whole." Cavalieri, 368 N.J. Super. at 537; see H.K., 184 N.J. at 384-85 (criticizing an agency head for rejecting an ALJ's credibility determinations of lay witnesses); In re Pub. Serv. Elec. & Gas Co., 35 N.J. at 376 ("Any review of the facts must be confined to the question of whether they are supported by substantial evidence, i.e., such evidence as a reasonable mind might accept as adequate to support a conclusion." (quoting In re Hackensack Water Co., 41 N.J. Super. 408, 418 (App. Div. 1956))). Still, "[a]ppellate courts must engage in a 'careful and principled consideration of the agency record and findings,'" and "not simply a pro forma exercise in which [the court] rubber stamp[s] findings that are not reasonably supported by the evidence." In re Taylor, 158 N.J. at 657-58 (second and third alterations in original) (first quoting Mayflower Sec. Co. v. Bureau of Sec., 64 N.J. 85, 93 (1973); then quoting Chou v. Rutgers, 283 N.J. Super. 524, 539 (App. Div. 1995)).

Applying these principles, we are satisfied Eggert has failed to meet his burden of proving DCA's decision was arbitrary, capricious, or unreasonable, or lacks fair support in the record. Eggert's arguments challenge the ALJ's core determination that Nelsen was a credible witness, but Eggert was not. The ensuing findings are dispositive of the issues in the case and the crux of Eggert's appeal. The DCA adopted the ALJ's credibility findings based on its determination that the findings were supported by sufficient competent and credible evidence in the record. Given our deferential standard of review, particularly of credibility assessments, we discern no basis to intervene. The exercise of our deference in these circumstances "is premised on our confidence that there has been a careful consideration of the facts in issue and appropriate findings addressing the critical issues in dispute." Bailey v. Bd. of Rev., 339 N.J. Super. 29, 33 (App. Div. 2001).

Eggert also argues "the sanction of revoking every one of his certifications was disproportionate to the 'paperwork' offenses cited, shocking the sense of fairness of any reasonable observer." "Our appellate review of an agency's choice of sanction is limited." Zahl, 186 N.J. at 353. "[W]hen reviewing administrative sanctions, 'the test . . . is whether such punishment is so disproportionate to the offense, in light of all the circumstances, as to be

26

shocking to one's sense of fairness.'" In re Herrmann, 192 N.J. 19, 28-29 (2007) (omission in original) (quoting In re Polk, 90 N.J. 550, 578 (1982) (internal quotation marks omitted)). Mindful that we "may not substitute [our] own judgment for the agency's," Stallworth, 208 N.J. at 194 (quoting Carter, 191 N.J. at 483), we are not convinced the sanction is so disproportionate to justify our intervention. Because Eggert was the highest-ranking officer in the TVFC and was responsible for the proper administration of the department, we are persuaded the sanctions imposed were proper.

Eggert further argues the DCA lacked authority to revoke his certifications, asserting "[d]iscipline of firefighters exceeds the authority granted by the UFSA and the other . . . enabling statutes." Eggert contends "[u]nder the UFSA, there is no stated violation for a firefighter's misconduct in performance of duties, failure to maintain a minimally acceptable level of competence, or material omissions to the [DFS]." Similarly, according to Eggert, "[n]o violation of the UFSA allows for the revocation of a firefighter's certification" and "[t]he UFSA contains no provision permitting the [DFS] to discipline firefighters."

"Normally, we do not consider issues not raised below at an administrative hearing." In re Stream Encroachment Permit, Permit No. 0200-04-0002.1 FHA,

402 N.J. Super. 587, 602 (App. Div. 2008) (citing <u>Bryan v. Dep't of Corr.</u>, 258 N.J. Super. 546, 548 (App. Div. 1992)). "[U]nless the questions so raised on appeal go to the jurisdiction of the trial court or concern matters of great public interest," we will decline to consider it. <u>Nieder v. Royal Indem. Ins. Co.</u>, 62 N.J. 229, 234 (1973) (quoting <u>Reynolds Offset Co. v. Summer</u>, 58 N.J. Super. 542, 548 (App. Div. 1959)). Because neither principle is implicated here, we will not consider the argument.

Lastly, Eggert argues "[t]he DCA misinterpreted the law in imposing revocations on [him] for purported administrative shortcomings." Eggert asserts the "[r]egulation and [s]tatute relied upon by [DFS] allow revocation for failures concerning the technical skills, abilities[,] and performances of the certificate holder in the context of fire[]fighting," not "for some perceived failure as an administrator."

"[T]he powers of an administrative agency should be liberally construed to permit the agency to achieve the task assigned to it, and . . . such administrative agency has such implied incidental powers as may reasonably be adapted to that end." <u>In re Heller</u>, 73 N.J. 292, 303 (1977) (quoting <u>In re Comm'r of Banking & Ins.</u>, 98 N.J. Super. 263, 271-72 (App. Div. 1967)). "Where . . . the task of the regulatory agency is to 'protect the health and welfare of members

of the public[,]' . . . the grant of implied powers is particularly important." Id.

at 303-04 (quoting Rite Aid of N.J., Inc. v. Bd. of Pharmacy, 124 N.J. Super.

62, 67 (App. Div. 1973)).

"The [UFSA] and related legislation . . . have been adopted to ensure

public safety and welfare." N.J.A.C. 5:73-1.3(b). Certification requirements

ensure "members of the fire service . . . have sufficient knowledge and

competence" to "adequately and effectively" conduct "fire suppression

activities." Ibid. Further, the certification requirements apply to "persons

involved in fire suppression activities including but not limited to firefighter

recruits, firefighters, fire officers, fire service instructors, and fire

investigators." N.J.A.C. 5:73-1.3(b)(1) (emphasis added).

We are satisfied that in order to fulfill its mandate of protecting public

safety and welfare, the DCA possesses the authority to revoke a fire chief's

certifications, even when the conduct involves failures as an administrator. This

is especially true considering the role of the fire chief, the highest-ranking

officer in a fire department. In Karins v. Atl. City, 152 N.J. 532, 562 (1998),

our Supreme Court stated:

> Conduct that weakens the public's trust tends to
> destroy the public's confidence in a fire department.
> Firefighters can perform their duties well only if they
> merit the trust and confidence of the community they

A-3501-23

serve. Public trust and confidence are essential to the department's effective and satisfactory operation. The [c]hief of a fire department has the responsibility of sedulously maintaining the departmental morale and discipline. The promotion of safety of persons and property is at the core of the mission of a fire department.

As the TVFC Chief, Eggert was responsible for maintaining the public's trust by ensuring the proper administration of the TVFC and promoting the safety of its firefighters, the public, and property. Put simply, because Eggert failed to fulfil his responsibilities as fire chief, thus weakening the public's trust, the DCA was authorized to revoke Eggert's certifications.

We reject Eggert's contention that the specific language of N.J.A.C. 5:73-1.3(b) does not allow the "use of the decertification process as a rebuke for some perceived administrative shortcoming." Under the code, the certification requirements apply to "persons involved in fire suppression activities including but not limited to firefighter recruits, firefighters, fire officers, fire service instructors, and fire investigators." N.J.A.C. 5:73-1.3(b)(1) (emphasis added). Because Eggert was involved in fire suppression activities as the TVFC Fire Chief, the certification requirements apply to him.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Hanley

Clerk of the Appellate Division

A-3501-23